# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN ALLIANCE FOR EQUAL
RIGHTS,

      Plaintiff,

v.

JORGE ZAMANILLO, *et al.*,

      Defendants.

Civil Action No. 1:24-cv-00509

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK
OF JURISDICTION**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

I.      THE SMITHSONIAN INSTITUTION, THE NATIONAL MUSEUM OF THE
        AMERICAN LATINO, AND THE INSTITUTE OF MUSEUM AND LIBRARY
        STUDIES. ..........................................................................................................3

II.     THE UNDERGRADUATE INTERNSHIP ......................................................4

III.    RESPONSES TO OPTIONAL DEMOGRAPHIC QUESTION FOR 2022 AND
        2023 APPLICANTS TO THE UNDERGRADUATE INTERNSHIP ..............10

IV.     THE 2024 APPLICATION CYCLE AND POTENTIAL HARMS TO THE
        MUSEUM IF THE APPLICATION PROCESS IS EXTENDED. .....................10

V.      PROCEDURAL HISTORY ...............................................................................11

LEGAL STANDARD .....................................................................................................12

ARGUMENT ..................................................................................................................13

I.      PLAINTIFF LACKS STANDING TO BRING ITS CLAIM SO ITS
        COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION ....13

        A.      Plaintiff Fails to Demonstrate Associational Standing ............................14

                1.      Member A does not have an actual or imminent injury ..................14

                2.      Any injury of Member A is not redressable by this Court .............17

        B.      Plaintiff Fails to Demonstrate Organizational Standing. ........................18

        C.      Plaintiff Lacks Standing to Sue Defendant Kemper. ..............................19

II.     PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS OF ITS EQUAL
        PROTECTION CLAIM. ....................................................................................20

        A.      No Express Racial or Ethnic Classification Exists in The Selection Process
                for The Undergraduate Internship. ........................................................21

        B.      Selection Criteria for The Undergraduate Internship Are Applied Neutrally
                and Plaintiff Cannot Show the Disparate Impact Needed to Suggest a
                Discriminatory Intent ............................................................................30

        C.      The Museum's Selection Process for The Undergraduate Internship Survives
                Rational Basis Review. ..........................................................................33

III.   PLAINTIFF FAILS TO DEMONSTRATE THAT IRREPARABLE HARM
       WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION..............34

IV.    THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST)
       DOES NOT FAVOR A PRELIMINARY INJUNCTION.......................................................36

CONCLUSION..................................................................................................................................37

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967) ................................................................................................17

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
  469 F.3d 129 (D.C. Cir. 2006) ...............................................................................19

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................................................17

*Am. Libr. Ass'n v. FCC,*
  401 F.3d 489 (D.C. Cir. 2005) ........................................................................ 14, 15

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) .................................................................................18

*Ayele v. Dist. of Columbia,*
  --- F.3d ---, 2023 WL 8354883 (D.D.C. Dec. 1, 2023) ........................................35

*Beacon Theatres, Inc. v. Westover,*
  359 U.S. 500 (1959) ................................................................................................34

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.,*
  996 F.3d 37 (1st Cir. 2021) ....................................................................................29

*Boykin v. Fenty,*
  650 F. App'x 42 (D.C. Cir. 2016) ...........................................................................31

*Brady v. Livingood,*
  360 F. Supp. 2d 94 (D.D.C. 2004) .................................................................... 30, 31

*Branton v. FCC,*
  993 F.2d 906 (D.C. Cir.1993) .................................................................................16

*Brnovich v. Democratic Nat'l Comm.,*
  594 U.S. ---, 141 S. Ct. 2321 (2021) .....................................................................30

*California v. Texas,*
  593 U.S. 659 (2021) ......................................................................................... 17, 18

*Carney v. Adams,*
  592 U.S. 53 (2020) ..................................................................................................18

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ................................................................... 34, 35, 36

*Cherokee Nation v. U.S. Dep't of Interior,*
  643 F. Supp. 3d 90 (D.D.C. 2022) ...............................................................19

*City of L.A. v. Lyons,*
  461 U.S. 95 (1983) ......................................................................................18

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................. 14, 15

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.,*
  68 F.4th 864 (4th Cir. 2023), *cert. denied,*
  ---S. Ct.---, 2024 WL 674659 (Mem.) (Feb, 20, 2024) ......................31, 32, 33

*Crowley v. Smithsonian Inst.,*
  636 F.2d 738 (D.C. Cir. 1980) ......................................................................3

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ...................................................................36

*Elect. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) .....................................................................18

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016) .....................................................................13

*Gomillion v. Lightfoot,*
  364 U.S. 339 (1960) ....................................................................................33

*Hale v. United States,*
  No. 13-1390, 2015 WL 7760161 (D.D.C. Dec. 2, 2015) .................................12

*Hayden v. Cnty. of Nassau,*
  180 F.3d 42 (2d Cir. 1999) ..........................................................................29

*Hettinga v. United States,*
  677 F.3d 471 (D.C. Cir. 2012) .....................................................................34

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .............................................................................. 13, 14

*In re Navy Chaplaincy,*
  697 F.3d 1171 (D.C. Cir. 2012) ...................................................................16

*In re Navy Chaplaincy,*
  738 F.3d 425 (D.C. Cir. 2013) .....................................................................33

*Jianqing Wu v. Special Counsel, Inc.,*
  54 F. Supp. 3d 48 (D.D.C. 2014), *aff'd*, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015)....................31

*Kim v. FINRA*,
    ---F. Supp. 3d---, 2023 WL 6538544 (D.D.C. Oct. 6, 2023) ........................................36

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................................................................17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................................*passim*

*Marouf v. Azar*,
    391 F. Supp. 3d 23 (D.D.C. 2019) .................................................................................19

*Munaf v. Geren*,
    553 U.S. 674 (2008) ........................................................................................................12

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ........................................................................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................................12, 36

*Nuziard v. Minority Business Development Agency*,
    ---F. Supp. 3d---, 2024 WL 965299 (N.D. Tx. Mar. 5, 2024) .......................................25

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric*,
    797 F.3d 1087 (D.C. Cir. 2015) ...............................................................................14, 18

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...................................................................................................31, 32

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................................13

*Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
    573 F. Supp. 3d 324 (D.D.C. 2021) ....................................................................12, 13, 17

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2001) ....................................................................................*passim*

*Sampson v. Murray*,
    415 U.S. 61 (1974) ....................................................................................................34, 36

*Sanchez v. Off. of State Superintendent of Educ.*,
    513 F. Supp. 3d 101 (D.D.C. 2021) ...............................................................................34

*Schmidt v. U.S. Cap. Police Bd.*,
    826 F. Supp. 2d 59 (D.D.C. 2011) .................................................................................12

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) .......................................................................................12

*Short v. Chertoff,*
    526 F. Supp. 2d 37 (D.D.C. 2007) ....................................................................................16

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ...........................................................................................................17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
    600 U.S. 181 (2023) ....................................................................................................*passim*

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................................. 13, 14

*Ultima Services Corp. v. U.S. Department of Agriculture,*
    ---F. Supp. 3d---, 2023 WL 4633481 (E.D. Tenn. July 19, 2023) .....................................25

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................................................33

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...........................................................................................................12

*Wisc. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) .......................................................................................35

*Worth v. Jackson,*
    451 F.3d 854 (D.C. Cir. 2006) .................................................................................. 16, 17

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ........................................................................................................33

## STATUTES

15 U.S.C. § 631 ......................................................................................................................26

20 U.S.C. § 41 .........................................................................................................................3

20 U.S.C. § 80u ................................................................................................................*passim*

20 U.S.C. § 9102 ............................................................................................................... 3, 19

20 U.S.C. § 9103 .....................................................................................................................3

## RULES

Fed. R. Civ. P. 12 ...................................................................................................................12

## OTHER AUTHORITIES

National Museum of the American Latino, *About the LMSP Undergraduate Internship,*
    https://perma.cc/S5G5-BBJE.................................................................................. 5, 6, 26

## INTRODUCTION

In its recent addition to the Smithsonian Institution, Congress sought to celebrate Latino life and culture for the whole of the United States through the National Museum of the American Latino ("the Museum"). The Smithsonian Institution has begun work to open the Museum's doors to the American people, and the Museum is already providing a benefit to students across the country by offering a valuable undergraduate internship opportunity: the Latino Museum Studies Program Undergraduate Internship ("the Undergraduate Internship"). Interns spend a semester in Washington, D.C. working on a non-curatorial practicum in the Latino museum studies field, and get invaluable career and museum exposure.

Even though the Museum does not consider the race or ethnicity of applicants to the Undergraduate Internship, Plaintiff, the American Alliance for Equal Rights, has filed this lawsuit seeking to undermine selection for the Undergraduate Internship on equal protection grounds. Plaintiff essentially asks the Court to infer that the Museum unconstitutionally discriminates against non-Latinos in awarding internships—notwithstanding the program's exclusively race- and ethnicity-neutral selection criteria that are publicly available on the Museum's website—based on Plaintiff's own suppositions about the number of Latino students who happen to meet these selection criteria and suppositions about the program's general goals. This argument defies longstanding equal protection precedent, which makes clear that a program may have a goal of increasing diversity, so long as selection for participation in that program is not based on race or ethnicity. *See Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2001). Contrary to Plaintiff's assertions, nothing in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023)—which addressed college admission processes that openly considered the race of individual applicants as a positive factor—alters that longstanding principle. Indeed, Plaintiff's view would extend the bounds of equal protection principles to invalidate any program with a goal of providing more opportunities for an

underrepresented group. That is not the law, and the Court should reject Plaintiff's attempt to turn equal protection law on its head.

Putting aside the failure of Plaintiff's constitutional claims, the Court should dismiss this case at the outset for lack of jurisdiction. Plaintiff has not met the irreducible requirements of Article III standing. Plaintiff does not have associational standing because it has identified only a single member of its organization as the basis for its standing, and that member has neither applied to nor been denied a place in the Undergraduate Internship. Under these circumstances, Plaintiff's member has not suffered any legally cognizable harm. To the extent Plaintiff alleges that its member is harmed by the threat of applying to a program where she (wrongly) believes that her race or ethnicity will be counted against her, that concern is speculative at best, and not a concrete injury sufficient to state an injury in fact. Further, Plaintiff's claim is not redressable. It seeks an injunction to prevent conduct which is neither occurring nor at risk of occurring: the consideration of race or ethnicity in the selection process for the Undergraduate Internship. Finally, Plaintiff has not pled organizational standing, much less any facts that could meet its stringent requirements.

Even assuming *arguendo* that this case were properly before the Court, Plaintiff's motion for a preliminary injunction should be denied. Plaintiff's equal protection claim is unlikely to prevail on the merits for the plain reason that the Museum does not classify or consider applicants based on their race or ethnicity. The Constitution does not prevent the Government from considering race or ethnicity in the creation of a policy, so long as the policy itself is neutral and applied in a non-discriminatory manner. Here, applicants are selected with regard only to race- and ethnicity-neutral factors and Plaintiff has not identified any intent by the Museum to discriminate against non-Latinos.

Finally, at this early stage, Plaintiff does not satisfy the remaining factors for issuance of a preliminary injunction. Plaintiff's conjectures about how the Museum would treat Member A's application cannot suffice to show irreparable harm, and the balance of the equities strongly favor the

Museum. Issuance of a preliminary injunction threatens the Museum's ability to fulfill its grant obligations as well as to provide an internship opportunity for the many talented students who are sure to apply.

Defendants respectfully request that the Court dismiss this case for lack of jurisdiction or, in the alternative, deny Plaintiff's motion for preliminary injunction.

**BACKGROUND**

## I.   THE SMITHSONIAN INSTITUTION, THE NATIONAL MUSEUM OF THE AMERICAN LATINO, AND THE INSTITUTE OF MUSEUM AND LIBRARY STUDIES

"The Smithsonian Institut[ion] was created by the Act of August 10, 1846, 'to increase and diffuse knowledge. . . .'" *Crowley v. Smithsonian Inst.*, 636 F.2d 738, 741 (D.C. Cir. 1980) (quoting 20 U.S.C. § 41). In 2020, Congress established within the Smithsonian Institution the National Museum of the American Latino ("the Museum"). 20 U.S.C. § 80u(c)(1). As stated by Congress, the Museum's purposes include: (1) "to illuminate the story of the United States for the benefit of all by featuring Latino contributions;" and (2) "to provide for the collection, study, research, publication, and establishment of exhibitions and programs relating to Latino life, art, history, and culture." *Id.* § 80u(c)(2). Congress empowered the Director of the Museum to "carry out educational and liaison programs in support of the goals of the Museum." *Id.* § 80u(f)(1)(A).

The Institute of Museum and Library Services ("IMLS") is not part of the Smithsonian Institution or the Museum, instead residing within the National Foundation on the Arts and the Humanities. *Id.* § 9102(a). IMLS is led by a director, who has primary responsibility for "the development and implementation of policy to ensure the availability of museum, library, and information services adequate to meet the . . . needs of the people of the United States." *Id.* § 9103(c)(1). In the authorizing legislation for the Museum, Congress instructed the Director of IMLS, in consultation with the Director of the Museum and the Museum's Board of Trustees, to establish a

3

"grant program with the purpose of providing internship and fellowship opportunities at American Latino museums." *Id.* § 80u(f)(2)(A)(ii). Although the statute does not specifically define "American Latino museum[s]," Congress stated that the term "American Latino museum" does not include the National Museum of the American Latino, thus excluding the Museum from IMLS's directive to provide grants for internship opportunities. *Id.* § 80u(f)(2)(B). IMLS does not fund, oversee, or have any other involvement with the Museum's Latino Museum Studies Program Undergraduate Internship, described *infra* Part II. Decl. of Laura Huerta Migus ¶ 3 ("Migus Decl.") (attached as Exhibit 1).

## II.    THE UNDERGRADUATE INTERNSHIP

The Latino Museum Studies Program is housed within the Museum and "focuses on developing museum practice within a framework of Latino cultural studies." Decl. of Diana Bossa Bastidas ¶ 2 ("Bastidas Decl.") (attached as Exhibit 2). Since 2022, one program within the Latino Museum Studies Program has been the Undergraduate Internship. *Id.* The Undergraduate Internship is a full-time semester-long program "designed to provide undergraduate students with a semester away that focuses on developing museum practice." *Id.* ¶ 3. During the semester, program participants attend "lectures, workshops, and tours at the Smithsonian," as well as completing a practicum at a Smithsonian museum or the National Gallery of Art. *Id.* The 2024 Practicums include: Processing Born Digital Fieldwork: Brazil in DC Documentation, Smithsonian 3D Viewer User Testing, Illuminating Latino Stories in Air and Space for Family Audiences, Folklife Fabrication and Design Skills, and Processing the Spanish Language Broadcasting Collection, among others. *Id.* Participation in the program is free to students, and includes accommodations, travel, and a weekly stipend.

National Museum of the American Latino, *About the LMSP Undergraduate Internship*, https://perma.cc/S5G5-BBJE.

Although the website advertising the Undergraduate Internship describes the program as being "designed to increase hands-on training opportunities for Latina, Latino, and Latinx-identifying undergraduate students interested in art museum careers," *id.*, there are only two eligibility criteria that limit who may apply to the Undergraduate Internship: "(1) the applicant must be an undergraduate student enrolled in an accredited U.S. college or university and (2) the applicant must be authorized to work in the United States." Bastidas Decl.¶ 4. The website states "the program focuses in non-curatorial museum roles including the areas of conservation, museum education, interpretation, digital culture, collections management, and exhibition design, fabrication and production." National Museum of the American Latino, *About the LMSP Undergraduate Internship*, https://perma.cc/S5G5-BBJE. According to the website, "the National Museum of the American Latino has partnered with the National Gallery of Art and select universities to diversify opportunities in museum studies and practice." *Id.* The Website says "[t]he program seeks to catalyze change in a field where only 5% of key museum positions are filled by people who identify as Latina, Latino, or Latinx." *About the LMSP Undergraduate Internship*, https://perma.cc/S5G5-BBJE.

The "Who Should Apply" section of the Undergraduate Internship's website echoes the eligibility criteria of being an undergraduate student authorized to work in the United States and also notes that "[r]elevant majors include, but are not limited to: Art, Art History, Art or Museum Education, Arts Management, Museum Conservation, Design, Digital Humanities, Museum Studies, Latino Studies, Anthropology, History, and related fields." National Museum of the American Latino, *About the LMSP Undergraduate Internship*, https://perma.cc/S5G5-BBJE (stating that "[u]ndergraduate students enrolled in accredited U.S. colleges and universities at the time of application are eligible to

apply" and "[a]pplicants must also be authorized to work in the United States"). Students who "meet these requirements" are "encourage[d]" to apply. *Id.*

Applications for the Undergraduate Internship are submitted through the Smithsonian Online Academic Appointment System ("SOLAA"). Bastidas Decl. ¶ 5. SOLAA is administered by the Office of Academic Appointments and Internships ("OAAI"). Bastidas Decl. ¶ 5; Decl. of Pamela E. Veenbaas ¶ 4 ("Veenbaas Decl.") (attached as Exhibit 3). OAAI has the central management and administrative responsibility for the Smithsonian's internships, fellowships, and other academic appointments. Veenbaas Decl. ¶ 2. OAAI and the Museum are separate units within the Smithsonian Institution, and report to different undersecretaries. *Id.*

The SOLAA Application Guide, which is available on the Undergraduate Internship's website, lists five sections to an application: (1) personal information; (2) current affiliation and academic history; (3) uploading program application materials; (4) applicant question section; and (5) the reference letter request. Bastidas Decl. ¶ 8 & Bastidas Decl. Ex. B. The "applicant question" section asks students about prior applications to the program and arrangements for academic credit, for links to their portfolio and the optional video essay, to describe their proficiency in English or Spanish, and to list previous relevant experience. Veenbaas Decl. ¶ 7 & Veenbaas Decl. Ex. A. The Undergraduate Internship also requires applicants to upload specific program application materials, including a resume/CV, transcripts, reference letter, and a personal statement. Bastidas Decl. ¶ 8 & Bastidas Decl. Ex. B. Applicants have two options for the personal statement. *Id.* The first option is to write an essay "[e]xplain[ing] your interest in exploring a museum career," addressing the applicant's "interest," their "career goals after college and how . . . participating in [the program would] help [them] accomplish these goals," and what they "hope to contribute to this experience," including how their "identities, life experiences, and/or perspectives shape [their] work" and how they would "shape your contributions" to the program. *Id.* The second option is for applicants to write a shorter essay on the

same topic and submit a two-to-three-minute video that "go[es] beyond what [the applicant] share[s] in [their] short essay." Bastidas Decl. Ex. B. These questions do not ask applicants to identify their race or ethnicity, and the Museum does not collect data on race or ethnicity from applicants to the Undergraduate Internship. *Id.*; *see also* Bastidas Decl. ¶ 7.

The essay topics were chosen to help select internship placements based on the applicants' interests. Bastidas Decl. ¶ 9. The purpose of the optional video is to provide an opportunity for applicants who would prefer to express themselves through another medium less focused on writing, as their skills may be more hands-on, technical, or creative. *Id.* Additionally, the application asks about proficiency in Spanish in order to assist staff with internship placements, as some projects may benefit from having an intern that is bilingual in English and Spanish (e.g., because they involve primary sources that are in Spanish). *Id.* ¶ 8.

Applicants are also asked to answer several optional demographic questions by OAAI. Veenbaas Decl. ¶ 9 & Veenbaas Decl. Ex. B. Notably, these questions are not specific to the Undergraduate Internship, but rather are appended to all opportunities posted on SOLAA, and the responses are not shared with the Museum. Veenbaas Decl. ¶ 9. The demographic question heading makes applicants aware that "this section is not part of the selection process and will be used for statistical purposes only" and states that applicants' "voluntary responses will have no effect on [applicants'] consideration." *Id.* The demographic questions ask whether applicants have a disability, how they identify their race, and whether they are "Hispanic" or "non-Hispanic." Veenbaas Decl. Ex. B. The optional demographic information collected by OAAI is used for "data analysis and reporting purposes in order to ascertain the statistics of the Smithsonian's interns and fellows." Veenbaas Decl. ¶ 10. Anonymous demographic data is provided to requesting units throughout the Smithsonian. *Id.* Examples include providing demographic data (disability status, ethnicity, race) to the Office of Equal Employment and Supplier Diversity, the Office of the Under Secretary for Education, and the Office

of Advancement. *Id.* The results of the demographic question on ethnicity "are not provided to the Museum." *Id.* ¶ 9. Although Plaintiff's Complaint alleges otherwise, *see* Compl. ¶ 16, the application for the Undergraduate Internship has never included the following: "The applicant is requested to answer the following questions: (For purposes of programmatic diversity only): Do you consider yourself as part of a Latino/Hispanic subgroup?  If so, which?" Veenbaas Decl. ¶ 8.

After applications are submitted, they are reviewed by a panel. Bastidas Decl. ¶ 10. This year, the Museum expects that the panel will be comprised of staff from the National Gallery of Art, internship coordinators from other Smithsonian museums or units, and alumni from a related fellowship program and previous years of the Undergraduate Internship. *Id.* Neither the Museum nor members of the review panel have access to applicants' answers to the optional demographic questions. *Id.* ¶ 7; Veenbaas Decl. ¶¶ 6, 9. The review panel is instructed to use a scoring rubric to evaluate applicants. Bastidas Decl. ¶ 11. This rubric, which is available on the Museum's website in advance of the application window, does not use race or ethnicity as a factor. *Id.* The scoring rubric asks reviewers to evaluate candidates on a scale from 0-5 points under the following headings: (1) Background, Interests, and Achievement (Resume/CV, Transcripts); (2) Personal Statement; (3) Practicum Selection; (4) Reference; and (5) Portfolio. *Id.* Bastidas Decl. Ex. C. In the "Personal Statement" section, for example, applicants are scored on whether they "[d]emonstrate[] interest in non-curatorial museum practice," "[o]utline[] examples of expected accomplishments," "[d]escribe[] how they will benefit from the program," and "[e]xplain[] how their unique perspective will shape their contributions." *Id.* And in the "Background, Interests, and Achievement" section, applicants are scored on their "[a]cademic history within focus areas," "[e]vidence of continued improvement in coursework," and whether they "[d]emonstrate[] high level of responsibility and/or community engagement (employment experience, volunteer work, leadership service, etc.)." *Id.*

In 2023, the Museum provided reviewers with "Review Guidelines for a Fair and Equitable Process" along with the scoring rubric. Bastidas Decl. ¶ 13. The Museum intends to provide substantially similar guidelines to reviewers for the 2024 selection process. *Id.* These guidelines were designed to "help make the review process as equitable and fair as we can," and included a section on "[m]inimizing bias." *Id.*; *see also* Bastidas Decl. Ex. D. Nothing in these review guidelines mentions or advises the use of race or ethnicity as a factor in evaluating applicants. *Id.* Applicants' scores are averaged, and the top sixteen applicants move on to the next stage of the process. Bastidas Decl. ¶ 11.

In addition to the sixteen applications identified by the review panel, the Museum considers sixteen other applicants who are nominated by the Museum's four partner universities, which include Arizona State University, City College of New York, New Mexico State University, and University of Texas – El Paso (the "Partner Universities"). *Id.* at ¶¶ 6, 11. The Museum works with these four universities to help recruit students to the Undergraduate Internship. *Id.* ¶ 6. The Museum provides the scoring rubric and review guidelines to the Partner Universities, and strongly recommends that the universities use the rubrics. *Id.* ¶ 11. The Partner Universities select an additional sixteen applicants to move on to the next stage of the process along with those who were considered through the SOLAA application process. *Id.*

From the thirty-two finalists (sixteen selected by the review panel and sixteen selected by the partner universities), Museum staff select sixteen awardees based on who best fits the internship practicums available. *Id.* ¶ 12. The practicums are assigned based on interest by the applicants, as well as academic and other experiences that demonstrate continued professional development by participating in that practicum. *Id.* For example, if an applicant has completed courses in conservation, they would be considered for conservation practicums based on the qualifications outlined in the descriptions available on the website. *Id.* Museum staff do not consider race or ethnicity in the

selection of the final sixteen awardees. *Id.* At least one applicant from each Partner University is selected. *Id.*

## III.   RESPONSES TO OPTIONAL DEMOGRAPHIC QUESTION FOR 2022 AND 2023 APPLICANTS TO THE UNDERGRADUATE INTERNSHIP

Separate and apart from the Museum's selection process, OAAI has compiled the data they received from the optional demographic question asking whether candidates consider their ethnicity to be "Hispanic" or "Non-Hispanic" for the 2022 and 2023 application cycles to the Undergraduate Internship. Veenbaas Decl. ¶ 11. The tables below reflect OAAI's data compilation:

| 2022 Internship Program Applicants | |
|---|---|
| Total Applicants | 38 |
| Identified as Hispanic | 26 |
| Did not identify as Hispanic by either responding No or choosing not to respond | 12 |
| Responded No | 1 |
| No Response | 11 |
| Percentage of Applicants identifying as Hispanic | 68% |

| 2022 Internship Program Awards | |
|---|---|
| Total Awards | 20 |
| Identified as Hispanic | 15 |
| Did not identify as Hispanic by either responding No or choosing not to respond | 5 |
| Responded No | 1 |
| No Response | 4 |
| Percentage of Awardees identifying as Hispanic | 75% |

| 2023 Internship Program Applicants | |
|---|---|
| Total Applicants | 104 |
| Identified as Hispanic | 69 |
| Did not identify as Hispanic by either responding No or choosing not to respond | 35 |
| Responded No | 3 |
| No Response | 32 |
| Percentage of Applicants identifying as Hispanic | 66% |

| 2023 Internship Program Awards | |
|---|---|
| Total Awards | 16 |
| Identified as Hispanic | 14 |
| Did not identify as Hispanic by either responding No or choosing not to respond | 2 |
| Responded No | 0 |
| No Response | 2 |
| Percentage of Awardees identifying as Hispanic | 88% |

Veenbas Decl. Ex. C.

## IV.   THE 2024 APPLICATION CYCLE AND POTENTIAL HARMS TO THE MUSEUM IF THE APPLICATION PROCESS IS EXTENDED

The 2024 dates for the Undergraduate Internship are August 26 to November 15, 2024. Bastidas Decl. ¶ 14. The application period opened on February 26, 2024, and closes on April 1, 2024.

*Id.*. The April 1 deadline for applications is "specifically designed to allow sufficient time" for the Undergraduate Internship to go forward in the fall semester of 2024. *Id.* ¶ 15. "Following the application deadline, the review panel and the Partner Universities need time to review and evaluate the applications, and the Museum needs time to make final selections." *Id.* After final selections, "the Smithsonian must complete background checks on each awardee." *Id.* Additionally, because the Undergraduate Internship is a semester-long program, and many undergraduates receive academic credit for their participation, the undergraduates often need to work with their home institutions before the end of their May semester to arrange their schedules and coursework appropriately to support their participation in the fall semester. *Id.* Accordingly, the Museum has determined that it cannot extend the application period past May 2024 and still conduct the Undergraduate Internship in the fall. *Id.* ¶ 16. If the Museum were forced to cancel the 2024 Undergraduate Internship, it would not only deprive students of the opportunity to participate but also jeopardize the Smithsonian's ability "to fulfill its grant obligations" to the foundation that provides funding support for the Undergraduate Internship.  *Id.* ¶ 17.

## V.    PROCEDURAL HISTORY

Plaintiff, the American Alliance for Equal Rights, filed its Complaint on February 22, 2024, alleging that Jorge Zamanillo, in his official capacity as Director of the Museum, and Crosby Kemper, in his official capacity as Director of IMLS, violated the Fifth Amendment by considering race in evaluating applications to the undergraduate internship program at the Museum.  *See* Compl., ECF No. 1. Plaintiff seeks declaratory and injunctive relief, attorneys' fees and costs, and "[a]ll other relief that the [American Alliance for Equal Rights] is entitled to." *Id.* at Prayer for Relief ¶ 47 (E). Plaintiff filed its motion for a preliminary injunction the same day, *see* Mot. for a TRO & Prelim. Inj. ("Pl.'s Mot."), ECF No. 3 , seeking to bar Defendants from "considering race or ethnicity as a factor when

considering applications or selecting interns for the challenged internship." Proposed Order, ECF No. 3-4.

On February 28, 2024, the Court granted the Parties' joint motion to modify the briefing schedule, and set a March 8, 2024 deadline for Defendants' combined opposition to Plaintiff's motion for preliminary injunction and motion to dismiss. *See* Minute Order (Feb. 28, 2024).[1]

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court must dismiss claims over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The plaintiff "bears the burden of proving by a preponderance of the evidence that the Court has subject-matter jurisdiction over her claims." *Schmidt v. U.S. Cap. Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "At the motion to dismiss stage, a challenge to the plaintiff's standing 'may take one of two forms.'" *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 332 (D.D.C. 2021) (quoting *Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015)). It can take the form of a "facial" challenge,

---

[1] Plaintiff also agreed to withdraw its request for a temporary restraining order based upon Defendants' agreement to this schedule. *See* Minute Order (Feb. 28, 2024).

arguing that the complaint does not allege facts sufficient to establish jurisdiction, or it can take the form of a "factual" challenge, disputing the factual allegations in the complaint. *Id.* at 332-33. Under a facial challenge, a court must assume the truth of the factual allegations in the complaint. *Id.* at 332. A factual challenge allows a court to resolve disputed issues of fact "pertinent to jurisdiction." *Id.* at 333 (citation omitted).

## ARGUMENT

## I.   PLAINTIFF LACKS STANDING TO BRING ITS CLAIM, SO ITS COMPLAINT SHOULD BE DISMISSED FOR LACK OF JURISDICTION.

At the outset, Plaintiff lacks Article III standing to bring its claim. The standing requirement ensures "that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks and citation omitted). And the "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

> Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of Animals v. Jewell*, 828 F.3d 989, 991-92 (D.C. Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61). A membership-based association like Plaintiff can establish standing in one of two ways: it can assert "associational standing" to sue on behalf of its members, *see Hunt v. Wash. State Apple Advert. Comm'n*,

432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of itself, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

Plaintiff fails to make the showing required for either associational standing or organizational standing. As to associational standing, Plaintiff does not demonstrate that at least one of its members has an actual injury that is redressable by this Court. And as to organizational standing, Plaintiff fails to allege any actual, nonspeculative injury to itself. Further, Plaintiff cannot show that any injury is traceable to Defendant Kemper. As such, Plaintiff's claim should be dismissed for a lack of jurisdiction and its motion for preliminary injunction should be denied.

### A.       Plaintiff Fails to Demonstrate Associational Standing.

#### 1.       Member A does not have an actual or imminent injury.

To meet the "constitutional minimum," Plaintiff must allege that at least one of its members suffered an injury that is "concrete and particularized" as well as "actual or imminent." *Lujan*, 504 U.S. at 560 (citation omitted); *Summers*, 555 U.S. at 498. Plaintiff has only identified a single anonymous member, Member A, as a basis for associational standing. Member A has not applied to the Undergraduate Internship, much less been exposed to any unlawful process or denied an internship. On the contrary, Member A claims only that she is "ready and able to apply" for an internship, either during the upcoming application cycle or the next one. Decl. of Member A ¶ 3; Compl. ¶¶ 34-35. But "[a]llegations of *possible* future injury are not sufficient" to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Thus, allegations or affidavits containing "speculative some day intentions are inadequate to demonstrate injury in fact." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 496 (D.C. Cir. 2005) (citation omitted); *see also Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." (citation omitted)). The allegations and affidavit of Member A are the sort of "speculative some day

intentions" that do not demonstrate an injury in fact. *Am. Libr. Ass'n*, 401 F.3d at 496 (citation omitted); *Lujan*, 504 U.S. at 564. A "plan" to apply for an internship, without more, is nothing more than an allegation of a "possible future injury" which is constitutionally insufficient. *Clapper*, 568 U.S at 409 (citation omitted).

In an attempt to circumvent this principle, Member A states that she cannot submit her application based on conjecture that her race and ethnicity might be considered against her if she were to apply. *See* Decl. of Member A ¶ 9; Compl. ¶ 34. But Plaintiff has not offered any concrete basis to assume that such an event would occur, nor does she even explain why that theoretical possibility has rendered her unable to apply in the first place. Plaintiffs cannot "manufacture" standing by "inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S at 416. Under these circumstances, the potential consideration of Member A's race or ethnicity is speculative at best. This is just the sort of hypothetical fear of future harm that is insufficient to confer standing. *See Clapper*, 568 U.S at 416.

Nor can Plaintiff claim an exception to this general rule based on its mere conjecture that Member A might face an unconstitutional barrier if she were to apply. To be sure, the Supreme Court has held that a plaintiff's "inability to compete on equal footing" as a result of the city's set-aside for minority-owned businesses constituted an "injury in fact" sufficient for standing, even though the plaintiff could not show that any of its members actually lost a contract due to the city's ordinance. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing."). But this principle does not apply where, as here, Member A has not even applied to the program and any purported barrier identified by Plaintiff is speculative at best.

15

The D.C. Circuit's decision in *Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006), illustrates this point. The *Worth* Court considered a prospective job applicant who "intended" to apply for a job at the Department of Housing and Urban Development ("HUD") and concluded that the plaintiff had standing to bring a facial challenge against HUD's written affirmative employment plan because it committed the agency to a "race-conscious policy favoring minorities and women." *Id.* at 856, 859. Importantly, however, the court also held that the plaintiff did *not* have standing to challenge the agency's unwritten "policies and practices." *Id.* at 860. In contrast to a written race-conscious policy, the application of an unwritten policy or practice to a prospective job applicant was "too remote and attenuated to establish a case or controversy under Article III," *id.* (quoting *Branton v. FCC*, 993 F.2d 906, 909 (D.C. Cir.1993)), because the individual may "never have to compete at a disadvantage for a new position," *id.* Having "challenge[d] no statute, regulation, or written policy committing HUD to favoring minorities or women, resting his claim instead on speculation, untethered to any written directive, about how HUD is likely to make future employment decisions," the court found that the plaintiff lacked standing. *Id.*; *see also In re Navy Chaplaincy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012) ("We have similarly found standing lacking where plaintiffs claimed future injury based on speculation about alleged discriminatory practices unconnected to concrete policies.").

Because Member A has not applied to the Undergraduate Internship Program, Plaintiff must allege that there is a statute, regulation, or written policy committing the Museum to favoring Latinos to demonstrate standing. *See Worth*, 451 F.3d at 860. Plaintiff's complaint contains no such allegation. *See generally* Compl. In fact, the written scoring rubric—which the Court may consider under 12(b)(1) even though it is outside of the complaint, *Short v. Chertoff*, 526 F. Supp. 2d 37, 41 (D.D.C. 2007)— demonstrates just the opposite. *See* Bastidas Decl. Ex. C. To the extent Plaintiff cites other sources (*e.g.*, general statements about the Undergraduate Internship's goals) in an attempt to suggest that Defendants nonetheless have an implicit "policy or practice" of considering applications in a race or

ethnic-conscious manner that favors Latino applicants, that theory is far "too remote and attenuated" to establish standing, just as the Plaintiff in *Worth*'s speculation "untethered to any written directive" was similarly insufficient. 451 F.3d at 860. Because Plaintiff's complaint does not allege facts sufficient to establish jurisdiction, the Court should dismiss the complaint for lack of jurisdiction and deny Plaintiff's motion. *Ranchers-Cattlemen Action Legal Fund*, 573 F.Supp.3d at 332 (concluding that under a "facial challenge" to standing under 12(b)(1), a court must dismiss a complaint that does not allege facts sufficient to establish jurisdiction.").[2]

### 2.   Any injury of Member A is not redressable by this Court.

Additionally, this Court could not remedy the purported injury that Member A asserts. In order to establish standing, an injury must be "likely [to be]. . . redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976)). The requested remedy must be "limited to the inadequacy that produced the injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)).

Plaintiff claims that the Museum's consideration of "race and ethnicity harms college students, like Plaintiff's member[]," who want to apply for an internship. Pl.'s Mot. at 2. It seeks an injunction preventing Defendants from "considering race or ethnicity as a factor when considering applications or selecting interns for the challenged internship." Proposed Order. But as the scoring criteria for the

---

[2] Because Member A contends only that she *may* face discrimination in connection with a *potential* application to the Museum's internship program, her claim is also not ripe for judicial review *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967) (prudential ripeness is a justiciability doctrine ensuring that courts do not make decisions on "abstract disagreements" over the application of "administrative policies" that have yet to be "formalized and . . . felt"); *Worth*, 451 F.3d at 860 (concluding that appellant's "free-wheeling challenge to HUD's 'policies and practices'" was not ripe for "judicial airing").

internship makes clear, the Museum takes neither race nor ethnicity into account when evaluating potential interns. *See* Bastidas Decl. Ex. C. Plaintiff's requested injunction thus seeks to enjoin behavior which is neither occurring nor at risk of occurring. *See id.* With no behavior to enjoin, Plaintiff's purported injury is not redressable by this Court. *California*, 593 U.S. at 673 (finding a lack of redressability where there was "no one, and nothing, to enjoin"). Accordingly, Plaintiff seeks nothing more than an "advisory opinion without the possibility of any judicial relief" that any potential consideration of race or ethnicity by the Museum would be impermissible. *See id.* (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 129 (1983) (Marshall, *J.*, dissenting)). This, of course, is constitutionally improper. *See Carney v. Adams*, 592 U.S. 53, 58 (2020).

Without a redressable injury, Plaintiff lacks associational standing to bring its claim; its complaint should be dismissed for lack of jurisdiction, and its motion denied.

### B.  Plaintiff Fails to Demonstrate Organizational Standing.

Plaintiff's failure to demonstrate associational standing cannot be saved by the doctrine of organizational standing. To establish organizational standing, a plaintiff must allege "that the defendant's action cause[s] a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Elect. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)). To determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm." *Id.* (quoting *PETA*, 797 F.3d at 1094).

Plaintiff has not asserted organizational standing, nor has it alleged any facts that could meet the doctrine's requirements at either step. Plaintiff's complaint simply alleges that "[t]he American

Alliance for Equal Rights is a nationwide membership organization that is dedicated to ending all classifications and preferences based on race and ethnicity." Compl. at ¶ 6. The Complaint neither alleges that its activities furthering this mission have been impeded nor that it used its resources to counteract harm. *See generally* Compl. And an inference that Defendants' alleged actions run counter to Plaintiff's mission is insufficient to confer organizational standing. *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (noting that organizations "that merely allege that their mission has been compromised" do not have standing). As Plaintiff is unable to meet the bounds of organizational standing, the Court should grant Defendants' motion to dismiss for want of jurisdiction and deny Plaintiff's motion for a preliminary injunction.

### C.     Plaintiff Lacks Standing to Sue Defendant Kemper.

For the reasons discussed above, Plaintiff lacks standing to bring its claim against any of the defendants in this case. But Plaintiff's claim against Defendant Kemper should also be dismissed because any alleged injury is not "fairly traceable" to Defendant Kemper's "allegedly unlawful conduct." *Marouf v. Azar*, 391 F. Supp. 3d 23, 34 (D.D.C. 2019) (quoting *Lujan*, 504 U.S. at 590). Nor could Plaintiff plead an injury traceable to Defendant Kemper. The traceability requirement necessitates a "causal connection between the injury and the conduct complained of," *Lujan*, 504 U.S. at 560, ensuring that "some part of the alleged injury would not have occurred, or will not occur, but for the challenged action," *Cherokee Nation v. U.S. Dep't of Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022).

Defendant Kemper is the Director of IMLS, which is separate and apart from the Smithsonian Institution and the Museum. *Compare* 20 U.S.C. § 9102(a), *with id.* § 80u(c)(1). Although Congress empowered the Director of IMLS, alongside others, to establish a "grant program with the purpose of providing internship and fellowship opportunities at American Latino museums," *id.* § 80u(f)(2)(A)(ii), Congress expressly excluded the Museum from the definition of "American Latino

museum," *id.* § 80u(f)(2)(b). Plaintiff avers that Defendant Kemper carried out the Undergraduate Internship at the Museum, but its sole allegation regarding Defendant Kemper rests upon a misreading of the Museum's statute. *See* Compl. ¶ 9 (citing 20 U.S.C. §80u(f)(2)(A)(ii)). Without more, Plaintiff has neither alleged, nor shown, that any injury has a connection to Defendant Kemper. Plaintiff has thus failed to demonstrate standing, and its claim should be dismissed, and motion denied, as to Defendant Kemper.

* * *

At every step, Plaintiff has failed to demonstrate that it, or its members, have standing to bring a claim. For these reasons, the Court should dismiss Plaintiff's complaint for lack of jurisdiction and deny its motion for a preliminary injunction.

## II.   PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS OF ITS EQUAL PROTECTION CLAIM.

Plaintiff is unlikely to succeed on its equal protection claim for the plain reason that the Museum does not treat applicants for the Undergraduate Internship differently based on their race or ethnicity. The selection process is entirely race- and ethnicity-neutral, and the Museum does not take race or ethnicity into account when awarding internships. Plaintiff's arguments to the contrary ignore the facts and attempt to graft a higher standard of scrutiny onto a race- and ethnicity-neutral program merely because that program is designed with diversity, among other goals, in mind. Equal protection principles require no such thing, and the Court should reject Plaintiff's attempt to undermine a valuable internship program for students with an interest in Latino museum studies.

The D.C. Circuit recognizes three ways to raise an equal protection violation. The first is to "allege that the government has expressly classified individuals based on their race." *Rothe Dev., Inc.*, 836 F.3d at 63 (citations omitted). Alternatively, a plaintiff can allege "that the government has applied facially neutral laws or policies in an intentionally discriminatory manner," or that "facially neutral laws

20

or policies result in racially disproportionate impact and are motivated by a racially discriminatory purpose." *Id.* (citations omitted).

Plaintiff is unlikely to succeed under any of these three standards. Neither race nor ethnicity is considered by the Museum at any point of the application or selection process, *see generally* Bastidas Decl., so Plaintiff cannot succeed under an express classification theory. Plaintiff has also failed to properly allege a claim that disparate impact may be used to infer discriminatory intent by failing to include any allegations that non-Latinos have applied for and been rejected from participation in the Undergraduate Internship. Even if Plaintiff had done so, there is no reason to believe that selection results in a disproportionate impact on non-Latinos. In any event, Plaintiff has not identified the requisite discriminatory intent to succeed on an equal protection claim, either by showing that the Undergraduate Internship has been awarded in a "discriminatory manner" or that the selection process is "motivated by a racially discriminatory purpose." *Rothe*, 836 F.3d at 63 (citation omitted). Rather, Plaintiff's allegations rest on statements by the Museum and related staff or former staff that evince a desire to promote diversity in the museum studies field. This desire, no matter how much Plaintiff's may oppose it, does not undermine the Museum's race-neutral application process or constitute an intent to discriminate against non-Latinos.

## A.    No Express Racial or Ethnic Classification Exists in The Selection Process for The Undergraduate Internship.

To succeed on a claim that the government has expressly classified individuals based on their race or ethnicity, a plaintiff must establish that race or ethnicity is, in fact, considered as a distinguishing factor. Plaintiff cannot do so here for the plain reason that Undergraduate Interns are selected without consideration of their race or ethnicity.

The Museum does not consider applicants' race or ethnicity at any point in the selection process for the Undergraduate Internship. Bastidas Decl. ¶ 9. After the application window closes, the

Museum refers the applications to a review panel comprised of staff from the National Gallery of Art, internship coordinators from other Smithsonian museums or units, alumni from a related fellowship program, and alumni from the Undergraduate Internship. *Id.* ¶ 10. The Museum does not ask for applicants' race or ethnicity, and the review panel does not have access to responses to OAAI's demographic questions. *Id.* ¶¶ 7-9. The review panel then uses a scoring rubric, which is publicly available on the Museum's website, to evaluate the candidates. *Id.* ¶ 11. Nothing in the scoring rubric factors in an applicant's race or ethnicity. *Id.* The scores from the review panel are averaged, and the applicants with the top sixteen scores are considered, along with sixteen applicants nominated by the Museum's four Partner Universities. *Id.* The Museum also requests that its Partner Universities nominate students using the scoring rubric. *Id.* From the thirty-two finalists, the Museum's staff select sixteen awardees based on who would be the best fit for the available practicums. *Id.* ¶ 12. The practicums are assigned based on interest by the applicants, as well as academic and other experiences that demonstrate continued professional development by participating in that practicum. *Id.* For example, if an applicant has completed courses in conservation, they would be considered for conservation practicums based on the qualifications outlined in the descriptions available on the website. *Id.* Museum staff do not consider an applicant's race or ethnicity in making the final awards. *Id.*

While the neutrality of the Museum's selection process speaks for itself, the Museum goes above and beyond by providing review guidelines to the panel and partner universities. *Id.* ¶ 13. In 2023, the guidelines "encourage[d] reviewers to 'minimiz[e] bias,' 'honor[] the applicant efforts,' and 'give the applications a fair review.'" *Id.*; *see also* Bastidas Decl. Ex. D. The 2023 guidelines also noted that "[p]rogram staff have intentionally designed the rubric to help meet our program goals and make the review process as fair and equitable as we can." *Id.* Nothing in the review guidelines references an applicant's race or ethnicity. *Id.*

In other words, the Museum selects participants for the Undergraduate Internship based on race- and ethnicity-neutral selection criteria, encourages reviewers to minimize bias, and does not have access to applicants' responses to demographic questions regarding race or ethnicity. These facts stand in stark contrast to those of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), the primary case relied upon by Plaintiff. There, the petitioner challenged two universities' acknowledged consideration of individual students' race in the admissions process. Harvard College, for example, admitted that application evaluators took individual students' race into account on the first read, at the subcommittee recommendation stage, in front of the entire admissions committee, and during the final admission class selection process. *Id.* at 194–95. During the Harvard College admissions process considered by the Court, the racial breakdown of various groups of applicants and tentatively admitted students were disclosed throughout the process. *Id.* at 194. At the University of North Carolina, the other university whose admissions process was evaluated by the Supreme Court, application readers were not only permitted, but "required" to consider the race of individual students in their review. *Id.* at 195.

Here, applicants are scored and evaluated without any regard to their race or ethnicity. The only fact Plaintiff alleges to the contrary is incorrect. Plaintiff wrongly states that the application includes the following question: "Do you consider yourself as part of a Latino/Hispanic subgroup? If so, which?" Anderson Decl., Ex. R.; Veenbaas Decl. ¶ 8. This question is not present on the current application for the Undergraduate Internship and was not present on prior years' applications for the Undergraduate Internship. *Id.* Plaintiff's incorrect allegation aside, OAAI does include a set of optional demographics questions on all applications posted on SOLAA, including a question asking whether applicants consider themselves "Hispanic" or "non-Hispanic." *Id.* ¶ 9. But these optional questions are used solely for demographic data collection by OAAI, and staff of the Museum and the Review Panel are not able to access this information. *Id.* ¶ 10. OAAI is not involved in the actual selection of

interns for the Undergraduate Internship and does not share this information with the Review Panel or staff of the Museum. *Id.* ¶ 9. The optional demographic question responses are used by OAAI for data analysis and reporting purposes in order to ascertain the statistics of the Smithsonian's interns and fellows. *Id.* ¶ 10. "Anonymous demographic data is provided to requesting units throughout the Smithsonian. Examples include providing demographic data (disability status, ethnicity, race) to the Office of Equal Employment and Supplier Diversity, the Office of the Under Secretary for Education, and the Office of Advancement." *Id.* The SOLAA Application Guide for the Undergraduate Internship, available on the program's web page, specifically states that applicants "will be asked to fill in personal information," but "[m]uch of this information is blinded from reviewers." Bastidas Decl. Ex. B. And the demographics section of the application itself plainly states: "The information provided in this section is not part of the selection process and will be used for statistical purposes only. Your voluntary responses will have no effect on your consideration." Veenbaas Decl. ¶ 9. Nothing in *Students for Fair Admissions* suggests that merely collecting demographic data with no impact on qualifications for admissions to a program is a race- or ethnicity-based classification.

In the absence of any actual racial or ethnic classification in the selection process, Plaintiff attempts to use statements about the Undergraduate Internship's goals and race and ethnicity-neutral questions referencing applicants' "identities" and offering a video essay option on the application itself to establish an express classification in the selection criteria. But nothing in equal protection principles prohibits the Museum from establishing an internship program with a goal of increasing diversity, so long as selection for participation in that program is not based on the race or ethnicity of individual applicants. *See Rothe Dev., Inc.*, 836 F.3d at 72. This Court should reject Plaintiff's attempt to graft the heightened review standard required for express racial and ethnic classifications onto any and all government programs that seek to increase diversity.

Plaintiff's argument primarily rests on statements from the Undergraduate Internship's website, as well as statements made by staff or former staff of the Museum and the Smithsonian Institution, describing the Undergraduate Internship. *See* Pl.'s Mot. at 3–4. These statements note the lack of Latino professionals in the museum field and explain that they believe the Undergraduate Internship will provide an opportunity for Latino students to gain experience in museum studies. But while statements from Museum staff may contribute to a "general understanding" of the Undergraduate Internship, they are not an "operative part" of the selection criteria used to evaluate applicants, and thus do not create a racial or ethnic classification. *Rothe Dev. Inc.*, 836 F.3d at 66 (quotation omitted).

In *Rothe Development, Inc. v. United States Department of Defense*, the D.C. Circuit considered whether certain provisions of the Small Business Act facially "classify individuals by race." 836 F.3d at 62.[3] The Act included a set of congressional findings, including a finding that certain persons may be socially disadvantaged "because of their identification as members of certain groups that have suffered the effects of discrimination," including "Black Americans, Hispanic Americans, Native Americans, Indian Tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other

---

[3] Although the D.C. Circuit's decision in *Rothe* predated the Supreme Court's decision in *Students for Fair Admissions*, nothing in *Students for Fair Admissions* undermines the D.C. Circuit's analysis. Because the Universities in *Students for Fair Admissions* were openly considering individual applicants' race in their admissions processes, the Court did not address considerations of diversity in race and ethnicity-neutral programs. *See* 600 U.S. at 194–98. Similarly, the recent decisions in *Ultima Services Corp. v. U.S. Department of Agriculture*, ---F. Supp. 3d---, 2023 WL 4633481 (E.D. Tenn. July 19, 2023) and *Nuziard v. Minority Business Development Agency*, ---F. Supp. 3d---, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) do not undermine the reasoning of *Rothe*. In those cases, the courts considered presumptions that individuals of certain races were disadvantaged, allowing them preferential treatment in government programs. *See Ultima Servs. Corp.*, 2023 WL 4633481, at *4; *Nuziard*, 2024 WL 965299, at *24. Because, unlike here, race was a consideration that provided a benefit in the provision of government programs, the parties in both cases agreed that strict scrutiny applied and limited their equal protection arguments to whether strict scrutiny was satisfied. *See Ultima Servs. Corp.*, 2023 WL 4633481, at *10 n.6; *Nuziard*, 2024 WL 965299, at *24. By contrast, as explained herein, there is no racial or ethnic classification associated with the Undergraduate Internship that would trigger the application of strict scrutiny.

25

minorities." *Id.* at 66 (quoting 15 U.S.C. § 631(f)(1)(C)). Emphasizing that these findings were separate from the statutory provision that "sets forth the program's terms and [conditions] for participation," the Court held that "Congress's findings that individual business owners may have been unfairly subjected to race-based disadvantage do not . . . impose or necessarily contemplate any race-based classification in the statutory response, nor do such findings supplant the race-neutral" operative definition in another portion of the statute. *Id.* The Court also acknowledged that Congress may have "identified certain racial groups" in announcing the policy for "many reasons," but concluded that the Court's concern is whether "in doing so, it "set special terms of preference for individuals based on their membership in a racial or ethnic minority group." *Id.* at 66-67.

The statements that Plaintiff refers to as creating a racial classification here are no different from the Congressional findings in *Rothe*. In the "about" section of the Undergraduate Internship website, the Museum states that the internship "is a museum career pathway program designed to increase hands-on training opportunities for Latina, Latino, and Latinx-identifying undergraduate students interested in art museum careers." National Museum of the American Latino, *About the LMSP Undergraduate Internship*, https://perma.cc/S5G5-BBJE. The website also characterizes the Undergraduate Internship program as "seek[ing] to catalyze change in a field where only 5% of key museum positions are filled by people who identify as Latina, Latino, or Latinx." *Id.* Staff and former staff of the museum and the Smithsonian Institution have also made similar statements. *See* Compl. ¶¶ 17-18.[4] But, importantly, these statements do not set "terms" that give preference to Latino applicants.[5] *Rothe*, 836 F.3d at 67. As previously explained, the selection criteria are entirely race and

---

[4] To the extent Plaintiff relies on outside media articles to support its argument that the Museum impermissibly discriminates against non-Latinos, *see* Pl.'s Mot. at 4, such articles, written by third parties, are wholly irrelevant to the Museum's practices and intent, which as explained herein, are race- and ethnicity-neutral.

ethnicity-neutral and the review panel cannot even access applicants' demographic information. Given Congress' determination that the Museum should "illuminate the story of the United States for the benefit of all by featuring Latino contributions," it is hardly surprising that the Museum believed that Latino students would be interested in the Undergraduate Internship. 20 U.S.C. § 80u(c)(2)(A). Even if the Museum created the Undergraduate Internship "with a consciousness" of the lack of Latino professionals in the museum field and the lack of opportunities in Latino museum studies, that "does not expose the statute to strict scrutiny." *Rothe*, 836 F.3d at 71. [6]

Moreover, Plaintiff grossly overstates the reach of statements regarding the goals of the Undergraduate Internship. For example, Plaintiff states that a goal of increasing diversity is just "racial balancing." Pl.'s Mot. at 7–8. But the Supreme Court only determined that the goal of increasing diversity was racial balancing when the Universities in *Students for Fair Admissions* openly and expressly considered race in admissions decisions. 600 U.S. at 223-24. There, the Court discussed racial balancing in the sense that trying to achieve a "rough percentage of various racial groups" in admissions was not appropriate. *Id.* Here, where the Museum has merely acknowledged that a small percent of professionals are Latino, but does not purport to try and "balance" that percentage by use of race- or ethnicity-conscious selection criteria, and where the application process is race and ethnicity-neutral, the same conclusion does not follow.

Straying even further from any express racial or ethnic classification, Plaintiff also argues that the application's race and ethnicity-neutral essay questions somehow act as a proxy to classify individuals on the basis of race and ethnicity. Pl.'s Mot. at 3 This argument is meritless. At the

---

[6] Plaintiff also conflates statements about the program's purpose with what it assumes the Museum might argue is a "compelling interest" if the application process were subject to heightened scrutiny. Pl.'s Mot. at 7–8. However, since the Museum does not discriminate on the basis of race or ethnicity in awarding internships, and thus strict scrutiny does not apply, the Museum is not required to establish a "compelling interest" to justify its internship program.

threshold, the application questions identified by Plaintiff do not require disclosure of an applicant's race or ethnicity. The application has two essay options. The first option asks students to "explain your interest in exploring a museum career," and asks students to address their "interest in the museum field," their "career goals after college" and how the Undergraduate Internship would further those goals, what they "hope to contribute to this experience," and how their "identities, life experiences, and/or perspectives shape your work . . . your internship project, the [Latino Museum Studies Program], and the Smithsonian more broadly." Bastidas Decl. Ex. B. The second option asks students to address the same prompt in a shorter essay and include a video that goes beyond what is shared in the short essay. *Id.*

According to Plaintiff, the use of the word "identities" in the essay question and the option to include a "video" "is designed to carry out . . . pro-Latino discrimination." Pl.'s Mot. at 3. Aside from the fact that the video is optional, and the essay prompts use of the word "identities" is only one small part of a much larger prompt, Plaintiff's argument rests on several problematic assumptions. Plaintiff mistakenly assumes that the only "identity" an applicant would discuss is their ethnicity, specifically whether they identify as Latino. And Plaintiff's assumption that an applicant's status as a Latino would be visible from their video rests on Plaintiff's apparent stereotype of how Latino (and non-Latino) individuals visually present. Finally, Plaintiff assumes that, even if applicants discuss their ethnicity as a part of their identity or are somehow visibly identifiable as a Latino in a video, the review panel would use that information to provide Latino applicants a benefit in the review process. These layered assumptions certainly do not point to an express classification based on applicants' ethnicity. Indeed, the Museum chose the specific essay topics to "help select internship placements based on the applicants' interests," and allowed for a video option "to provide an opportunity for applicants who would prefer to express themselves through another medium less focused on writing, as their skills may be more hands-on, technical, or creative." Bastidas Decl. ¶ 9.

28

But even if, as Plaintiff contends, one goal of the applicant process is to encourage members of a group underrepresented in the museum world to apply to the internship, that would not automatically translate the questions into an express classification. *See, e.g.*, *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) (designing entrance exam to "diminish the adverse impact on black applicants" did not constitute a racial classification because "the exam was administered in a race-neutral fashion. . ."); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 49 (1st Cir. 2021) ("[T]here is no likely controlling reason why one cannot prefer to use facially neutral and otherwise valid admissions criteria that cause underrepresented races to be less underrepresented."). Because the application "employs only uncontrived criteria that could easily be adopted in a world in which there were no races," the application does not require express classification by race or ethnicity that would be subject to heightened scrutiny under equal protection principles. *Id.* That an individual applicant might identify their race or ethnicity in response to an essay question does not change this analysis. Indeed, in *Students for Fair Admissions*, the Court expressly contemplated that scenario, noting that "nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." 600 U.S. at 230.

Plaintiff's conclusion that "[t]he Museum's internship discriminates based on race and ethnicity," Pl.'s Mot. at 2–5, cannot stand up to the reality of the Undergraduate Internship program. The Museum's selection process for the Undergraduate Internship does not take race or ethnicity into account at any point, and nothing Plaintiff identifies undermines that fact. Thus, Plaintiff is unlikely

to succeed on their claim that the Museum expressly classifies applicants based on their race or ethnicity.[7]

### B. Selection Criteria for The Undergraduate Internship Are Applied Neutrally and Plaintiff Cannot Show the Disparate Impact Needed to Suggest a Discriminatory Intent.

Having failed to establish an express racial classification, Plaintiff is left only with the argument that the race- and ethnicity-neutral application process is applied with discriminatory intent to negatively impact non-Latinos. This argument fails at every turn. Not only has Plaintiff failed to properly allege a disparate impact in its Complaint, or much less show that there is a likelihood of success on the merits of showing disparate impact sufficient to infer discriminatory intent, data from the Smithsonian's administrative office contradicts Plaintiff's insinuation that only individuals who identify themselves as Latino are selected for the Undergraduate Internship. That alone is enough for the Court to conclude that Plaintiff is unlikely to succeed on the merits of their claim. *See, e.g.*, *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004). But even if Plaintiff had identified a disparate impact, it is not stark enough for the Court to infer discriminatory intent, and Plaintiff has not identified any other indicia that discrimination against non-Latinos motivates the selection of students for the Undergraduate Internship. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. ---,141 S. Ct. 2321, 2339 (2021) ("[T]he mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity.").

To measure whether the application process for the Undergraduate Internship results in a disparate impact on non-Latinos, "the proper metric . . . requires" comparing non-Latinos' "share of the number of applications" to the Undergraduate Internship "versus that group's share of the offers

---

[7] For the same reasons, Plaintiff's conclusions that the Museum "sets quotas" by "barring all non-Latinos from the internship," "uses race and ethnicity as a negative," "impermissibly stereotypes," and engages in "racial consideration" without an "end point" are all controverted by the plain terms of the Museum's selection process. *See* Pl.'s Mot. at 8–9 (citation omitted).

extended," i.e. the "success rate," of applications for non-Latinos against the "success rate" of applications for Latinos. *See Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 881 (4th Cir. 2023), *cert. denied*, --S. Ct.--, 2024 WL 674659 (Mem) (Feb. 20, 2024). "Put most simply, searching for a racially 'disproportionate' impact necessitates a relative inquiry among racial groups, not a simple appraisal of one group's performance over time." *Id.* Plaintiff has made no attempt to meet this standard. In its motion, Plaintiff states that "not a single intern identified as black, Asian, or white" and "nearly 90% of participants" identified as Latino. Pl.'s Mot. at 4–5. Even taking this statement as true, it does not address whether and to what extent non-Latino students applied for the Undergraduate Internship, nor does Plaintiff suggest that Member A or any other of Plaintiff's members previously applied for the Undergraduate Internship. Without any allegation at all as to the comparator group, Plaintiff cannot establish a likelihood of success showing a disparate impact between two groups. *See Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) (affirming dismissal of disparate impact claim when appellant failed to "allege facts suggesting that the closure affected a greater proportion of [protected class] than non-[protected class]"); *Brady v. Livingood*, 360 F. Supp. 2d at 100 ("Common sense and fairness . . . dictate that a plaintiff, at a minimum, allege *some* statistical disparity" to plead disparate impact."); *Jianqing Wu v. Special Counsel, Inc.*, 54 F. Supp. 3d 48, 54–56 (D.D.C. 2014) (dismissing claims for failing to allege disparate impact), *aff'd*, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015).

Although Plaintiff's disparate impact claim is unlikely to succeed for all the reasons identified above, Plaintiff also identifies no intent to discriminate against non-Latinos, which separately dooms Plaintiff's claim. Equal protection principles "guarantee[] equal laws, not equal results." *Coal. for TJ*, 68 F.4th at 887 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979)). Accordingly, evidence of a discriminatory purpose is required. *Id.* Such "purpose . . . implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279 (citation omitted). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not

31

merely in spite of, its adverse effects upon an identifiable group." *Id.* Plaintiffs are not likely to make such a showing here.

Plaintiff has not identified any "direct evidence of discriminatory intent," such as statements or documents showing that the selection process for the Undergraduate Internship "was adopted because of a specific intent to reduce the number of" non-Latinos participating in the internship or "to otherwise bring hardship to bear on those" applicants. *See Coal. for TJ*, 68 F.4th at 883. The race-neutral selection criteria themselves, as already explained, "stand[] directly and forcibly in the way of such a finding." *See id.* Thus, Plaintiff is left to argue that the Museum and staff's statements about the goals of the program are sufficient to infer discriminatory intent. *See id.* But even if these statements evince a desire, consistent with Congress's creation of a museum to highlight Latino contributions, to design the application process in a manner that would "increase the rate[]" of Latino interns, they do not support a finding of discriminatory intent. *See id.* at 885–86 ("To the extent the Board may have adopted the challenged admissions policy out of a desire to increase the rates of [minority enrollment] — that is, to improve racial diversity and inclusion by way of race-neutral measures— it was utilizing a practice that the Supreme Court has consistently declined to find constitutionally suspect.").

Plaintiff also attempts to label prior interns' ethnicities based on cherry-picked Internet searches and stereotyping to extrapolate discriminatory intent. Pl.'s Mot. at 5. But Plaintiff's post-selection internet searching to find descriptions of interns' ethnicity is both unseemly and irrelevant. Plaintiff's conclusions rely on descriptions of candidates from a variety of sources, many including third-party descriptions of the candidates. *Id.* These post-selection sources say nothing about whether the review panel was aware of the applicant's race or ethnicity at the time they were selected. The third-party sources do not even say anything about whether the awardees themselves identify as Latino. Nor do these sources indicate specific efforts to exclude non-Latinos from the Undergraduate Internship. In fact, data collected by OAAI indicates just the opposite. Although, as previously

explained, application reviewers do not have access to demographic information, whether an applicant self-identified as Hispanic in response to the demographic question was not determinative of whether they were awarded a position. Veenbaas Decl. ¶ 11 & Veenbaas Decl. Ex. C (showing that 25% of awardees did not choose to select "Hispanic" in 2022 and that 12% of awardees did not choose to select "Hispanic" in 2023).

Finally, even assuming Plaintiff had pled a disparate impact at all, which it has not, Plaintiff certainly has not identified an impact so egregious that discriminatory intent can be inferred from the impact alone. "[S]uch cases are rare," and require a pattern "as stark as that" in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The D.C. Circuit has rejected arguments that even "statistically significant" differences between comparator groups are sufficient to meet this standard and has required the consideration of "potential confounding factors" accounting for disparities, even where they exist. *See In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013). Where, as here, the Plaintiff has not even alleged that a non-Latino person applied and was rejected from the Undergraduate Internship, and data from the Smithsonian Institution is consistent with the race neutral selection procedures, Plaintiff is not likely to succeed on the merits of an equal protection claim requiring inference of discriminatory intent from a disproportionate impact.

In addition to a disparate impact, "[a]n Equal Protection plaintiff alleging purposeful racial discrimination must show at least some specific intent to target a certain racial group and to inflict adverse effects upon that group." *Coal. for TJ*, 68 F.4th at 886. Because Plaintiff has not only failed to allege a disparate impact, but has also failed to show any discriminatory intent, Plaintiff is unlikely to succeed on the merits of its equal protection claim.

C.     **The Museum's Selection Process for The Undergraduate Internship Survives Rational Basis Review.**

The remainder of Plaintiff's arguments are limited to whether the Museum has a compelling interest in using race in its selection criteria for the Undergraduate Internship, and whether its use of race is narrowly tailored to that interest. But these arguments would only be relevant if the Museum relied on a racial classification subject to heightened scrutiny, which, as previously established, it has not. "A statutory classification that 'neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Sanchez v. Off. of State Superintendent of Educ.*, 513 F. Supp. 3d 101, 113 (D.D.C. 2021) (quoting *Hettinga v. U.S.*, 677 F.3d 471, 478 (D.C. Cir. 2012)). The Museum's selection process easily satisfies this standard. The scoring rubric tracks the application requirements, including emphasis on the applicant's prior experiences, portfolio, and personal statement. Bastidas Decl. Ex. C. Moreover, final decisions by the Museum staff are closely tied to the available practicums for summer interns. Bastidas Decl. ¶ 12. And while Plaintiff does not appear to contest that the selection process would survive rational basis review, the scoring rubric and ranking system is clearly rationally related to the Undergraduate Internship.

For all of these reasons, Plaintiff is not likely to succeed on the merits of its claim, and its motion for preliminary injunction should be denied.

### III. PLAINTIFF FAILS TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

The touchstone for injunctive relief "has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959)). As such, a court can deny a motion for preliminary injunctive relief if the movant fails to demonstrate irreparable harm, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To be irreparable, the threatened injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quotation omitted). And the injury

must also be "beyond remediation." *Id.* The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury. *Ayele v. Dist. of Columbia*, --- F.3d ---, 2023 WL 8354883, at *6 (D.D.C. Dec. 1, 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

Plaintiff's assertion of irreparable harm centers around the theory that Defendants have committed unconstitutional discrimination. Pl.'s Mot. at 10. But Plaintiff has not demonstrated that it is likely to succeed on the merits of its equal protection claim. *See supra* Part II. And the allegation that Defendants are violating Plaintiff's equal protection rights is insufficient to establish irreparable harm. *Ayele*, 2023 WL 8354883, at *6. Plaintiff has thus failed to demonstrate an irreparable injury. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Nor has Plaintiff identified an injury that is "certain" or irreparable. *See id.* Plaintiff claims that the Museum's consideration of race and ethnicity in evaluating applications to its internship program injures its Member A. Pl.'s Mot. at 2. But before all else, Member A has not even applied to the Undergraduate Internship, so her injury cannot be "certain." *See id.*; *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (noting that "[t]he injury complained of [must be] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." (citation omitted)); Decl. of Member A ¶ 3. And as the Museum's scoring rubric for intern applications show, race and ethnicity are not considerations for an internship.[8] *See* Ex. C. to Bastidas Decl. For these reasons, and because it has failed to demonstrate an "actual or imminent" injury, *see supra* Part I.A.1, Plaintiff has not shown an injury that is "certain." *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

---

[8] Plaintiff also argues that its claim of irreparable harm is "especially stark" because Member A "could forever lose her opportunity to compete for an internship." Pl.'s Mot. at 10. Because the Museum does not consider race or ethnicity in evaluating internship applications, nothing stands in the way of Member A applying and competing for this internship beyond her own refusal to do so.

The crux of Plaintiff's argument is that Member A will not apply to the Undergraduate Internship until the Court orders the program to be race neutral, Decl. of Member A ¶¶ 2, 9, and so will be closed out of this application cycle unless the Court enters an injunction barring Defendants from "considering race or ethnicity as a factor when considering applications or selecting interns." Proposed Order. But, again, applications to the Undergraduate Internship are already considered on a race and ethnicity-neutral basis. *See generally*, Bastidas Decl. It is thus neither Defendants' actions, nor the absence of an injunction, that will leave Plaintiff with "no do over," as it claims. *See* Pl.'s Mot. at 11 (quotation omitted). And Member A cannot concoct an irreparable harm by making the choice not to apply to an internship in the meantime. Under these circumstances, Plaintiff has not shown that it faces the heart of injunctive relief: an irreparable injury. *See Sampson*, 415 U.S. at 88; *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. The Court should deny its motion.

## IV.   THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION.

An injunction also is not appropriate because the balance of the equities and the public interest tip sharply in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiff cannot establish the first two factors necessary to obtain an injunction, "it is clear [it] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

But even if Plaintiff could satisfy one or both of those factors, the remaining factors tip decisively in Defendants' favor. *See Kim v. FINRA*, ---F. Supp. 3d---, 2023 WL 6538544, at *16 (D.D.C. Oct. 6, 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."). There is no dispute that protecting Equal Protection rights that are genuinely at risk is in the public interest. But the

unfounded, speculative risk of harm to Member A—who has yet to even apply to the Undergraduate Internship— must be weighed against the interest of Defendants in selecting interns, and the interests of students setting their schedules by accepting a semester-long internship. *See* Bastidas Decl. ¶¶ 14-16. A delay in the application period could force the Museum to close the Internship Program for all students, and jeopardize the Smithsonian's ability to fulfill its grant obligations. *Id.* ¶ 17. Accordingly, even if the Court were to reach the balance of the equities and the public interest, it should conclude that those factors weigh against granting the relief Plaintiff seeks.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction and grant Defendants' motion to dismiss.

Dated: March 8, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY NESTLER
Assistant Branch Director, Federal Programs Branch

*/s/ Rachael L. Westmoreland*
DOROTHY M. CANEVARI
(NY Bar No. 5989694)
RACHAEL L. WESTMORELAND
(GA Bar No. 539498)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-1280
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*